UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


TRANSPAC MARINE, LLC,                    )
                                         )
                Plaintiff,               )
                                         )        CIVIL ACTION NO.
v.                                       )        20-10115-DPW
                                         )
YACHTINSURE SERVICES, INC.,              )
                                         )
                Defendant.               )


<u>MEMORANDUM AND ORDER</u>
February 13, 2023

TABLE OF CONTENTS

I. BACKGROUND................................................... 4

   A.   Factual Background ..................................... 4

      1.   Mr. Young's Renewal Application ....................... 5

      2.   Events Preceding the Destruction of the Vessel ........ 8

      3.   Plaintiff's Claim and Defendant's Denial .............. 13

   B.   Travel of the Matter .................................. 14

   C.   The Parties' Contentions ............................... 15

II. LEGAL STANDARD.............................................. 17

III. DISCUSSION................................................. 17

   A.   Jurisdiction ......................................... 17

   B.   Choice of Law ........................................ 21

   C.   Legal Framework Applicable to This Matter .............. 23

      1.   Interpretation of Marine Insurance Contracts under Federal Law ................................................ 23

      2.   The Parties' Framing of the Legal Doctrines ........... 24

   D.   Interpretation of Relevant Terms of the Hurricane Plan . 30

      1.   Question 15: Number of Lines Securing the Summer Star . 30

      2.   Question 19: Safety Arrangements in the Event of a Named Storm Warning ........................................... 33

   E.   Consequences of Breach of Promissory Warranties ........ 35

   F.   Plaintiff's Breach ................................... 38

      1.   Question 15 ........................................... 38

      2.   Question 19: Safety Arrangements in the event of a Named Storm Warning ........................................... 42

IV. CONCLUSION................................................. 44

This matter concerns the voidability of a marine insurance policy under principles of federal maritime law.  Plaintiff Insured pursues a claim for breach of contract against Defendant Insurer, based on the insurer's refusal to pay for damage sustained by Plaintiff's insured vessel during a hurricane in August of 2019.  The Insured contends that the damage to the vessel, along with the costs he has incurred as a direct result of the vessel's demise, are covered by his marine insurance policy and that he is entitled to the compensation provided for in his policy.

By contrast, the Insurer asserts that the policy issued to Plaintiff is void as a matter of law.  The Insurer contends that it is beyond dispute that the Insured made material misrepresentations in his application for insurance coverage, which voids the policy in its entirety.

The parties advance cross-motions for summary judgment. Those motions require me to consider an insured's duty under federal maritime law to comply strictly with its representations and warranties in a marine insurance policy.

I will grant summary judgment to the Insurer because the Insured breached its promissory warranties to the Insurer under the policy.  I will correlatively deny summary judgment to the Insured.

3

## I. BACKGROUND

Plaintiff **Transpac Marine, LLC,** ("Transpac") on behalf of its sole owner and managing member **Ralph Young,**[1] brings the instant action against its insurer, Defendant **Yachtinsure Services, Inc.** ("Yachtinsure"), for breach of their marine insurance policy. [Dkt. No. 1 at 1] Yachtinsure asserts counterclaims for declaratory judgment, 28 U.S.C. § 2201, seeking this court's judgment that Mr. Young's insurance policy is void as a matter of law and that Yachtinsure has no obligation to pay damages. [Dkt. No. 8 at 25]

### A.  *Factual Background*

Ralph Young owned and lived on a seventy-four-foot motor operated vessel named the SUMMER STAR ("the vessel"). [Dkt. No. 28-3 at 1 & 28-1 at 1] Mr. Young insured the vessel through Plaintiff Transpac with Defendant Yachtinsure Services, Inc. from 2013 through 2019. On August 28, 2019, the vessel ran aground and was destroyed when Hurricane Dorian hit St. Thomas in the United States Virgin Islands, where the vessel was

---

[1] Because Ralph Young is the sole owner and managing partner of Plaintiff Transpac Marine, LLC, the sole signatory and beneficiary of the insurance policy at issue, and the sole operator of the vessel at all times relevant to this matter, [Dkt. Nos. 24-3 at 1; 39-1 at 18,] I will refer to Mr. Young as Plaintiff and use his name interchangeably with the designation Plaintiff throughout this Memorandum, recognizing, of course, that as a matter of form, it is Transpac Marine, LLC as the Insured that brings this action on his behalf.

moored.  Mr. Young tendered abandonment of the vessel, submitted a claim for his damages to Yachtinsure, and demanded payment in accordance with his insurance policy.  [Dkt. No. 24-3 at 2] Yachtinsure rejected the abandonment and denied Mr. Young's claim, based on what it considered his material misrepresentations in his April 2019 policy renewal application. [Dkt. 8 at 17]

### 1.   Mr. Young's Renewal Application

On April 16, 2019, Mr. Young submitted an application for the renewal of his marine insurance policy to Yachtinsure for the period of April 25, 2019, to April 25, 2020.  [Dkt. No. 28-3 at 4]  To renew his existing policy, Mr. Young was obligated to submit an updated application form and a Hurricane Plan for review by Yachtinsure's underwriters.  [Dkt. No. 28-3 at 4-6]

Yachtinsure's Hurricane Plan required substantive responses to twelve questions regarding how the subject vessel, the SUMMER STAR, would generally be operated and the safety precautions Mr. Young would take in the event of a tropical storm.  Mr. Young's responses to two of those questions are of particular relevance to the instant matter.

The Hurricane Plan inquired in Question 15: "How many **lines** are going to be used to secure the vessel and what is the **diameter** and **material** of those lines?"  Mr. Young responded: "10 lines, 3/4 inch Nylon braid" [Dkt. No. 24-5 at 1 (emphasis in

original)]  In Question 19, it asked: "What arrangements have
you made for the safety of your vessel in the event that a named
storm warning is issued?"  Mr. Young responded "Constant weather
watch and advance reservations at marinas[.]"  [Dkt. No. 24-5 at
2]

The Hurricane Plan form provided by Yachtinsure also
required applicants to sign a "Declaration" confirming that the
applicant had disclosed all material facts, i.e., those "likely
to influence acceptance or assessment of this hurricane
questionnaire/plan by underwriters[,]" and that the applicant's
representations were, to the best of his knowledge, true.  [Dkt.
No. 24-5 at 2]  The applicant was warned that the Hurricane Plan
contains "statements upon which underwriters will rely in
deciding to accept this insurance" and that the Hurricane Plan
"will form the basis of" any insurance contract between the
parties.  [Dkt. No. 24-5 at 2]  The declaration also stated that
misrepresentation or nondisclosure of material facts "may
entitle underwriters to void the insurance."  [Dkt. No. 24-5 at
2]

Mr. Young completed and signed the Hurricane Plan on behalf
of Transpac Marine, LLC on April 15, 2019 and submitted the
documents to Yachtinsure the following day.  [Dkt. No. 24-5 at
2]  On April 17, Mr. Young's broker received a follow-up email
from Yachtinsure's representative regarding the submitted

6

Hurricane Plan.  The representative stated in this email that **"we need confirmation that the lines will be doubled in the event of a named/numbered windstorm."**  [Dkt. No. 28-3 at 3(emphasis in original)]  Mr. Young responded to his broker with an email, which appears on this record to have been forwarded to Yachtinsure's representative, stating "Confirmed that in the event of a named/numbered storm, mooring lines will be doubled."  [Dkt. No. 28-3 at 3]  Yachtinsure asserts, and Mr. Young does not dispute, that Mr. Young's email representation that he would double the mooring lines on the vessel in the event of a named windstorm was incorporated into his policy agreement with Yachtinsure.[2]  [See Dkt. No. 30 at 13]

Yachtinsure's representative sent an email to Mr. Young's broker on April 24, 2019, with a list of special conditions for the renewal of Mr. Young's policy and an attached "cover summary with all endorsements that apply."  Among those special conditions was the statement that renewal was "subject to an updated Hurricane preparation plan being seen and agreed by underwriters within 14 days from inception."  [Dkt. No. 28-3 at 2]  The Yachtinsure representative also reiterated that

---

[2] The email exchange in the summary judgment record directly reflects only that Mr. Young sent his confirmation to his broker, Rick Shinn.  [Dkt. No. 28-3 at 3-4]  Defendant represents that it received and relied upon the assurances in Mr. Young's confirmation.  Mr. Young does not dispute that his confirmation email was sent to Yachtinsure.

Yachtinsure "need[s] the HPP document [Hurricane Plan] updated with confirmation that the insured will double the amount of lines in the event of a windstorm."[3]  [Dkt. No. 28-3]

On April 24, 2019, Yachtinsure issued a marine insurance policy to Transpac Marine, LLC, Policy No. ASI00620200, which took effect the next day and expiring on April 25, 2020.  [Dkt. No. 1-2]  The policy Declaration issued by Yachtinsure listed as a "Special Condition" of the policy that "an updated Hurricane preparation plan be[] seen and agreed by" Yachtinsure's underwriters.  [Dkt. No. 1-2 at 3]

    2.   <u>Events Preceding the Destruction of the Vessel</u>

During an examination under oath conducted by Yachtinsure related to this matter, Mr. Young provided the following account of the events leading to the destruction of the SUMMER STAR, and the steps he took to comply with his Hurricane Plan and to mitigate the damages to the vessel.  [See generally Dkt. No. 39-1]

On August 24, 2019, while living on the SUMMER STAR in the area of the United States Virgin Islands, Mr. Young became aware of a tropical storm on track to hit the area of the Greater

---

[3] If Mr. Young submitted an updated Hurricane Plan signed after April 24, 2019, as these special conditions would suggest, that document is not included in the summary judgment record before me.  The only written version of the Hurricane Plan in the record was signed by Mr. Young on April 15, 2019.  [Dkt. No. 24-5]

Antilles in the coming days.  Mr. Young began to monitor the
storm's trajectory on several online weather-monitoring sites.[4]
At that time, the storm was projected to track south and make
landfall in the Dominican Republic.  [Dkt. No. 39-1 at 39]  Mr.
Young held a month-to-month contract reserving a berth at a
marina in Puerto Del Ray, Fajardo in Puerto Rico where he might
have been able to shelter from the storm.[5]  However, after
considering the then-projected trajectory of the storm at that
time, he judged it unsafe to attempt to reach Puerto Rico.
[Dkt. No. 39-1 at 29]  Instead, he decided to sail to Crown Bay
in St. Thomas, US Virgin Islands where the storm was expected to
pass with windspeeds below thirty-miles-per-hour.  [Dkt. No. 39-
1 at 39]

On or about August 26th, after he had arrived at Crown Bay
in St. Thomas, Mr. Young sought to reserve a berth at the Crown
Bay Marina.  [Dkt. No. 39-1 at 51-52]  Although he had sheltered

---

[4] Mr. Young monitored multiple weather services online, including
NOAA, The Weather Channel, Weather Underground, Windfinder, Wind
Guru, and Windy.com.  [Dkt. No. 39-1 at 29]
[5] In materials submitted by the parties, there appears to be a
dispute as to whether Mr. Young, in fact, had an advance
reservation at a marina. In an examination under oath taken
August 28, 2018, Mr. Young said that he was in a written month-
to-month contract with a marina in Fajardo, Puerto Rico.  [Dkt.
39-1 at 23-34 and 29] Yachtinsure maintains, however, that Mr.
Young admitted in a different examination under oath, conducted
on November 26th, 2019, that he did not have an advance
reservation at marinas in either St. Thomas or Puerto Rico.
[Dkt. 27-13 at 6]

at Crown Bay Marina during Hurricane Erika in 2015 and had docked there several times prior to August 2019, Mr. Young had no contractual reservation arrangement with Crown Bay Marina [Dkt. No. 39-1 at 29, 51] and admitted that he made no attempt to contact the Marina in advance of his arrival on August 26th. When he did arrive at the Marina, he found it closed to all vessels and did not try to make a reservation.  [Dkt. No. 39-1 at 51]  Mr. Young made no further efforts to speak to the staff of the Crown Bay Marina, and he did not seek alternative arrangements at any other local marinas on or near St. Thomas. [Dkt. Nos. 27-13 at 4; 39-1 at 41-42, 44 51]

Mr. Young resolved to wait out the storm, still tracking to the south of St. Thomas towards the Dominican Republic and Puerto Rico, at a single mooring in Crown Bay.  [Dkt. No. 39-1 at 20, 41, 52]  Mr. Young later said that at that time, he was in the practice of securing the vessel with four mooring lines of an unspecified diameter when engaging a single mooring. [Dkt. No. 39-1 at 26]  On August 26, he purchased two, new, one-inch diameter mooring lines from the local chandlery in preparation for the storm.  [Dkt. No. 39-1 at 41]  Beyond securing the vessel with those two additional mooring lines and moving upholstery below deck, Mr. Young made no further safety preparations.  [Dkt. No. 39-1 at 42]

10

Mr. Young continued to monitor the storm's progress over the coming days using weather-tracking online sources.  On August 27th, a hurricane watch was issued for the area of the US Virgin Islands.  [Dkt. No. 39-1 at 43]  By that date, the storm's path, while still expected largely to bypass the Virgin Islands, shifted and was then projected to strike Puerto Rico and possibly St. Croix.  [Dkt. No. 39-1 at 40-41]  Mr. Young maintained his plan to wait out the storm in Crown Bay based on the storm's then-trajectory.  [Dkt. No. 39-1 at 42]

On August 28, 2019, the storm, by then named Hurricane Dorian, changed its trajectory and struck the Virgin Islands.  Mr. Young testified that around 8:00 A.M. that morning, weather sources predicted wind speeds in the Virgin Islands to reach a maximum of forty knots.  By 11:00 A.M., Mr. Young observed wind speeds in Crown Bay of up to 50 knots.  He testified that the NOAA online storm-tracking service was reporting that the hurricane had taken "a sharp right and headed directly towards the Virgin Islands," where it would make landfall in a matter of hours.  [Dkt. No. 39-1 at 46]

By the time he learned that the storm would hit the Virgin Islands, Mr. Young believed that it would not have been feasible to escape the hurricane by sailing to Puerto del Rey in Puerto Rico, or to any other hurricane holes, because doing so would require him to sail into or follow the path of the storm.  [Dkt.

11

No. 39-1 at 47-48]  Mr. Young would have had to contend with
twelve-foot seas and winds close to 100 knots, which he
determined to be unsafe.  [Dkt. No. 39-1 at 49]  Instead, he
decided to remain moored to a single mooring in Crown Bay,
secured by six lines, four of unspecified diameter and two of a
one-inch diameter.  [Dkt. No. 39-1 at 26, 47]

Just after noon, high winds from Hurricane Dorian parted
Mr. Young's mooring lines, causing the vessel to drift out to
sea.[6]  [Dkt. No. 39-1 at 55]  Mr. Young immediately set down his
heaviest anchor in an attempt to secure the vessel in the Bay.
[Dkt. No. 39-1 at 56]  However, the anchor's chain became
entangled with a sailboat operated by a third-party mariner, Dan
Radulewicz.  Thereafter, as alleged, Mr. Radulewicz disconnected
Mr. Young's anchor gear causing the SUMMER STAR to be swept up
in the storm.  The vessel eventually ran aground on the lee
shore about four miles from Crown Bay.  [Dkt. No. 39-1 at 60]
Mr. Young was airlifted from the wreck by the United States
Coast Guard.  [Dkt. Nos. 27-11 at 4; 39-1 at 62]

---

[6] It remains unclear in the summary judgment record before me
how, exactly, Mr. Young's six mooring lines became parted from
the single-mooring ball the SUMMMER STAR was tied to.  While I
can resolve the two competing summary judgment motions before me
without undertaking a causation analysis, I will note that if my
analysis required an exploration of whether the lines were a
cause of the loss of the vessel, this aspect of the record would
need to be developed further.

The vessel suffered catastrophic damage when it ran aground.  [Dkt. No. 39-1 at 62-63]  Mr. Young attempted to remove the vessel from the reef but lacked the resources to do so immediately after the storm.  [Dkt. No. 39-1 at 62-65]  Another storm, Tropical Storm Karen, hit the Virgin Islands days later.  Because Mr. Young was unable to access the vessel to salvage it prior to Tropical Storm Karen, the SUMMER STAR sustained further damage in this second storm.  According to the salvor who assessed the vessel's condition, the vessel was left in three pieces — a total loss — after Tropical Storm Karen.  [Dkt. No. 39-1 at 80, 87]

Mr. Young was ordered by the United States Coast Guard to pay for the removal of all pollutants contaminating the surrounding area as a result of the wreck of his vessel.  Mr. Young complied and the environmental cleanup effort cost him approximately $245,000.  [Dkt. No. 24-3 at 2]  He was also ordered to remove the vessel and its debris from the lee shore area, which is estimated to cost an additional $250,000.  [Dkt. No. 24-3 at 2]

### 3.   Plaintiff's Claim and Defendant's Denial

Mr. Young filed a claim declaration with Yachtinsure on September 3, 2019.  [Dkt. No. 27-11]  He declared losses for multiple forms of damage, including hull damage, engine and machinery damage, keel and rudder damage, and damage to personal

property.   In his declaration, Mr. Young also explained that he faced potential liability to Mr. Radulewicz for damages the SUMMER STAR may have inflicted on Mr. Radulewicz's sailboat when the two vessels became entangled in the storm.   [Dkt. No. 27-11 at 4-5]  On February 14, 2020, Defendant Yachtinsure issued a letter formally denying Mr. Young's insurance claim.

**B.   *Travel of the Matter***

On January 21, 2020, Mr. Young, through Transpac Marine, LLC, filed the instant Complaint asserting a single count of breach of contract.[7]  [Dkt. No. 1]  Yachtinsure responded by filing an Answer and Counterclaims against Transpac on March 17, 2020.  Yachtinsure raises four counterclaims for declaratory judgment pursuant to 28 U.S.C. § 2201: Misrepresentations of Material Facts regarding Hurricane Dorian (Count I) and Tropical Storm Karen (Count II); and Violations of Uberrimae Fidei regarding Hurricane Dorian (Count III) and Tropical Storm Karen (Count IV).  As to each counterclaim, Yachtinsure seeks the same remedy: this court's declaratory judgment that Yachtinsure has

---

[7] Transpac also appears to advance, though not with any degree of clarity, a claim for attorneys' fees under Mass. Gen. Laws ch. 93A and Florida Statute § 627.428.  Even if Mr. Young's complaint survived Yachtinsure's motion for summary judgment — and I conclude that it will not — the policy's choice of law clause, providing that established federal maritime law, and if no such law exists, then New York law, as the governing law, would bar recovery under Massachusetts and Florida law.  [Dkt. No. 11 at 21]  *See Great Lakes Ins. SE* v. *Andersson*, 544 F. Supp. 3d 196, 200 (D. Mass. 2021).

no obligation to Mr. Young under the marine insurance policy issued on April 24, 2019, because that policy is void.  [Dkt. No. 8 at 16-26]

In his answer to Yachtinsure's Counterclaims, Mr. Young asserts that this court lacks jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201, to address Yachtinsure's four counterclaims because no case or controversy exists beyond the adjudication of the parties' insurance policy contract, which will necessarily be resolved in the litigation of his original Complaint.

From March to May of 2021, the parties attempted to resolve their claims through mediation but were unsuccessful.  [Dkt. Nos. 19; 21; 22]  On September 20, 2021, Transpac filed its Motion for Summary Judgment and Statement of Undisputed Facts. [Dkt. No. 24]  The same day, Yachtinsure filed its own Motion for Summary Judgment as to Count I of the Complaint and as to all counts of its Counterclaim, [Dkt. No. 25,] together with its own Concise Statement of Material Facts.  [Dkt. No. 27]

C.  *The Parties' Contentions*

Mr. Young contends that his marine insurance policy cannot, as a matter of law, be found voidable because no reasonable factfinder could find that he breached his duties under the policy.  In substance, Mr. Young argues that he materially complied with the terms of the Hurricane Plan and any further

efforts at compliance would not have been possible in the circumstance in which he found himself.  Mr. Young also points out that his damages were caused, not by any breach of the policy terms, but by the conduct of Mr. Radulewicz, the third-party mariner who disconnected Mr. Young's anchor line.

Yachtinsure contends that Mr. Young made material misrepresentations in his policy renewal application because he failed to meet the obligations established in his Hurricane Plan.  [Dkt. No. 26 at 5-6]  Specifically, Yachtinsure asserts that Mr. Young in disregard of his Declaration concerning Question 15 failed to a) secure his vessel with the 10 mooring lines he represented he would use under normal weather conditions in the Hurricane Plan; b) double the mooring lines securing the vessel during a named storm, as he represented in his April 19th email confirmation; and in disregard of his Declaration concerning Question 19, failed to obtain advanced reservations at a marina, either in Puerto Rico or in the Virgin Islands, as he reported he would in the Hurricane Plan.  Had Yachtinsure's underwriters been aware that Mr. Young would not meet these obligations, Yachtinsure asserts, it would not have issued Mr. Young the marine insurance policy it did at the price it did.  As a result, Yachtinsure urges me to conclude the policy was void as a matter of law.

## II. LEGAL STANDARD

A party is entitled to summary judgment only if that party demonstrates that there remain no genuine factual disputes that would impact the outcome of the case, and consequently that judgment as a matter of law is appropriate. FED. R. CIV. P. 56(a). "At the summary judgment stage, the [district] court examines the entire record in the light most flattering to the nonmovant and indulg[es] all reasonable inferences in that party's favor." *Cadle Co.* v. *Hayes*, 116 F.3d 957, 959 (1st Cir. 1997) (internal quotations omitted). When considering cross-motions for summary judgment, the district court "must view each motion, separately, through this prism." *Est. of Hevia* v. *Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010).

## III. DISCUSSION

### A. *Jurisdiction*

Count I of Mr. Young's complaint is a breach of contract claim raising the enforceability or voidability of a marine insurance policy, and therefore arises under this court's maritime jurisdiction. 28 U.S.C. § 1333; *Com. Union Ins. Co.* v. *Pesante*, 459 F.3d 34, 37 (1st Cir. 2006); *Windsor Mount Joy Mut. Ins. Co.* v. *Giragosian*, 57 F.3d 50, 54 (1st Cir. 1995) ("The propriety of maritime jurisdiction over a suit involving a marine insurance policy is unquestionable.").

17

This court's jurisdiction over Yachtinsure's counterclaims asserted under the Declaratory Judgment Act, 28 U.S.C. § 2201, however, merits further discussion.  Mr. Young asserts that this court lacks subject matter jurisdiction as to Yachtinsure's counterclaims because they are duplicative of its affirmative defenses to his original breach of contract claim.  Thus, Mr. Young argues, none of Yachtinsure's counterclaims present an independent actual case or controversy for this court to resolve.  [Dkt. 30 at 17-18]

Pursuant to the Declaratory Judgment Act, a federal district court may, "[i]n a case of actual controversy within its jurisdiction . . . declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  "However, a mere demand for declaratory relief does not by itself establish a case or controversy necessary to confer subject matter jurisdiction."  *S. Jackson & Son, Inc.* v. *Coffee, Sugar & Cocoa Exch. Inc.*, 24 F.3d 427, 431 (2d Cir. 1994).  To constitute an actual controversy for the purposes of 28 U.S.C. § 2201(a), the dispute raised must be the type of case or controversy contemplated by Article III.  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007); *see In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993) ("the statute authorizing the declaratory judgment remedy explicitly

incorporates the Article III case or controversy limitation.")).
Accordingly, the Supreme Court has required that "the facts
alleged, under all the circumstances, [must] show that there is
a substantial controversy, between parties having adverse legal
interests, of sufficient immediacy and reality to warrant the
issuance of a declaratory judgment." *Maryland Cas. Co.* v. *Pac.
Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *MedImmune, Inc.*, 549
U.S. at 127.

I conclude Yachtinsure's counterclaims present an actual
controversy within the meaning of Article III, over which this
court has subject matter jurisdiction.  To resolve Yachtinsure's
counterclaims, I would not be issuing an advisory opinion
regarding "what the law would be upon a hypothetical state of
facts" that have not yet ripened into a concrete dispute.
*MedImmune, Inc.*, 549 U.S. at 127 (internal quotations omitted).
Rather, Yachtinsure's counterclaims present concrete, immediate
disputes between parties with adverse legal interests that have
already brought them before this court.

Whether I will exercise my discretion to entertain
Yachtinsure's counterclaims for declaratory judgment is a
separate matter.  Even if a declaratory judgment claim raises an
actual controversy, a district court has "complete discretion in
determining 'whether and when' to entertain a counterclaim for
declaratory judgment" under 28 U.S.C § 2201.  *Zurich Am. Ins.*

19

*Co.* v. *Watts Regul. Co.*, 796 F. Supp. 2d 240, 246 (D. Mass. 2011) (quoting *Wilton* v. *Seven Falls Co.*, 515 U.S. 277, 282 (1995) ("district courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites.")).  I may decline to entertain such a counterclaim or may grant an opposing party's motion to strike it under FED. R. CIV. P. 12(f),[8] when the counterclaim is redundant of the proponent's affirmative defenses, *Zurich Am. Ins. Co.*, 796 F. Supp. 2d at 246, and "seeks resolution of legal issues that will, of necessity, be resolved in the course of the litigation of the other causes of action."  *See Sofi Classic S.A. de C.V.* v. *Hurowitz*, 444 F. Supp. 2d 231, 249 (S.D.N.Y. 2006).

While it is true that "motions to strike are generally disfavored, the Court possesses considerable discretion" to resolve them by, for example, striking claims that only raise "issues already before the court by virtue of [the Complaint] and [Defendant's] Answer."  *Zurich Am. Ins. Co.*, 796 F. Supp. 2d

---

[8] "Rule 12(f) provides that a district court 'may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.'  FED. R. CIV. P. 12(f).  The court may either strike [the pleading] on its own or on a motion by a party and has considerable discretion in striking any redundant . . . matter."  *Delta Consulting Grp., Inc.* v. *R. Randle Const., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009).

at 246.  The court may, for example, strike a duplicative counterclaim in order "to expedite the case by removing 'unnecessary clutter from the case.'" *Id.* (quoting *Heller Fin., Inc.* v. *Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989)).

I observe in this matter that Yachtinsure's counterclaims are redundant of its affirmative defenses to Mr. Young's breach of contract claim.  Yachtinsure advances the same legal and factual arguments regarding the voidability of Mr. Young's insurance policy in support of its declaratory judgment claims, as it does in its motion for summary judgment as to Transpac's Complaint.  Yachtinsure's counterclaims raise only the legal and factual issues already before me concerning whether the parties' insurance policy is voidable due to Mr. Young's representations in its application for policy renewal.  In light of my ultimate conclusion, for the reasons discussed more fully in Part III.E, that Yachtinsure is entitled to summary judgment as to Count I of the Complaint because it is excused from performance under the insurance policy as a matter of law, I find Yachtinsure's counterclaims to be moot as redundant and will not address separately the question of summary judgment regarding them.

**B.   *Choice of Law***

When acting pursuant to its maritime jurisdiction, a federal district court will "apply federal choice of law rules."

*Maclean* v. *Travelers Ins. Co.*, 299 F. Supp. 3d 231, 234 (D. Mass. 2017); *see also Great Lakes Ins. SE* v. *Andersson*, 544 F. Supp. 3d 196, 201 (D. Mass. 2021); *Com. Union Ins. Co.* v. *Flagship Marine Servs., Inc.*, 190 F.3d 26, 30 (2d Cir. 1999).

Here, the parties' marine insurance policy contains a choice of law clause providing:

> coverages issue(s) on any and all such litigation between [the parties] is to be resolved by reference to the well-established, entrenched principles of the federal maritime law of the United States. Only in the event that there is no such well-established, entrenched principle(s) of federal maritime law of the United States [] then shall the dispute as to coverage or amount be resolved according to the applicable law of the State of New York."

[Dkt. No. 1-1 at 21]

A general principle of federal choice of law rules is that if "a maritime contract includes a choice of law clause, that choice governs unless the jurisdiction has no substantial relationship to the transaction or parties, or the law of that jurisdiction conflicts with the fundamental purposes of maritime law." *Maclean*, 299 F. Supp. 3d at 234; *Great Lakes Ins. SE*, 544 F. Supp. 3d at 201. Under the express terms of the parties' policy, any well-established, entrenched principles of federal maritime law govern the parties' dispute because federal maritime jurisdiction has a substantial relationship to the parties' marine insurance policy dispute. *See Maclean*, 299 F. Supp. 3d at 234. While I conclude that settled principles of

federal maritime law govern the parties' dispute, for reasons
discussed more fully below I do not find the applicable
governing principles to be precisely the ones the parties
themselves advance.

**C.   *Legal Framework Applicable to This Matter***

   1.   Interpretation of Marine Insurance Contracts under
        Federal Law

   The Supreme Court held in *Norfolk S. Ry. Co.* v. *Kirby*, that
"federal law controls the contract interpretation" of a marine
insurance policy when the contractual dispute at issue "is not
inherently local," 543 U.S. 14, 22-23 (2004).[9]  I observe that
"the First Circuit has held that there is a judicially
established federal rule governing th[e] particular area of
marine insurance contract interpretation" relevant to this
matter: whether an insured's representations in the policy
constitute unambiguous, promissory warranties which, if

---

[9] "The First Circuit will conduct the 'inherently local' inquiry
only if a state has clearly expressed a rule contrary to the
federal rule, or demonstrated a strong interest in a different
rule." *Atl. Specialty Ins. Co.* v. *Karl's Boat Shop, Inc.*, 480
F. Supp. 3d 322, 334 (D. Mass. 2020) (citing *Lloyd's of London*
v. *Pagan-Sanchez*, 539 F.3d 19, 25 (1st Cir. 2008)).  Here, I
need not conduct such an inquiry, because I would reach the same
outcome under either federal or New York law.  First Circuit
courts applying federal maritime law and "courts in New York
[in] treat[ing] the failure to comply with an express warranty .
. . preclud[e] recovery under a policy, regardless of whether
the warranty was causally related to the ultimate loss." *Safe
Harbor Pollution Ins.* v. *River Marine Enterprises, LLC*, 593 F.
Supp. 3d 82, 92 (S.D.N.Y. 2022); *Lloyd's of London* v. *Pagán-
Sánchez*, 539 F.3d at 26.

breached, excuse the insurer from coverage.  *N. Assur. Co. of Am.* v. *Keefe*, 845 F. Supp. 2d 406, 414 (D. Mass. 2012) (citing *Lloyd's of London*, 539 F.3d at 24-25).

The First Circuit has long held that "whether there is any ambiguity in [provisions of a maritime insurance contract] is a question of law for the court to determine." *Lloyd's of London*, 539 F.3d at 22 (quoting *Littlefield* v. *Acadia Ins. Co.*, 392 F.3d 1, 6 (1st Cir. 2004)).  The terms of a marine insurance policy are construed in accordance with the plain meaning of contractual language and the court will reject any interpretation that contradicts the "clear and unambiguous" meaning of that language.  *Id.* at 23.  *See generally Norfolk S. Ry. Co.*, 543 U.S. at 31-32 (noting that when "the words of a . . . contract, have a plain and obvious meaning, all construction, in hostility with such meaning, is excluded."); *see also J-Way S., Inc.* v. *United States Army Corps of Engineers*, 34 F.4th 40, 46 (1st Cir. 2022) (holding the plain language of maritime contract made clear that its purpose was to facilitate maritime commerce).

## 2.   The Parties' Framing of the Legal Doctrines

At the core of the contentions both parties now advance before me is a shared assumption that Mr. Young's responses to inquires in the Hurricane Plan were representations of then-existing facts.  Yachtinsure argues that Mr. Young

misrepresented his safety preparations in his Hurricane Plan by
stating both that he would use "10 lines" of Nylon braid, each
of 3/4 inch diameter, to secure the vessel, and would double the
number of lines in the event of a named windstorm, but failed to
do so during Hurricane Dorian; and that he had advance
reservations at marinas when he did not.  I read Mr. Young's
somewhat meandering response to assert, in substance, that the
terms of the Hurricane Plan are ambiguous, that his
representations in the Hurricane Plan were truthful, and that he
materially complied with the terms of the Plan.  [*See generally,*
Dkt. No. 30]

Based on their assumption that Mr. Young's responses were
factual representations, the parties frame their dispute in
terms of the doctrines of uberrimae fidei and the warranty of
truthfulness.  Because the parties present their contentions in
terms of these doctrines, I will briefly outline those doctrines
before turning to the somewhat different approach that I
conclude is properly applicable.

The doctrine of uberrimae fidei is an established precept
of federal maritime law which imposes a duty of utmost good
faith upon the insured in his dealings with his marine insurance
provider.  *QBE Seguros* v. *Morales-Vazquez*, 986 F.3d 1, 6 (1st
Cir. 2021) ("the doctrine of uberrimae fidei is an established
rule of maritime law in this Circuit." (quoting *Catlin at*

*Lloyd's* v. *San Juan Towing & Marine*, 778 F.3d 69, 80–81 (1st Cir. 2015)). "Under the doctrine, an insurer may void a marine insurance policy if its insured fails to disclose 'all circumstances known to [the insured] and unknown to the insurer' that materially impact the insurer's risk calculus." *Id.* at 4 (quoting *Catlin at Lloyd's*, 778 F.3d at 83). "Materiality is to be gleaned by evaluating the likely impact of facts that may influence a prudent insurer when considering whether to issue a particular policy." *Id.* at 11. *See also Grande* v. *St. Paul Fire & Marine Ins. Co.*, 436 F.3d 277, 282–83 (1st Cir. 2006). Yachtinsure claims that Mr. Young's misrepresentations in the Hurricane Plan were material to its decision to issue Mr. Young the policy it did at the price it did and, thus, breached his duty of utmost good faith.[10]

---

[10] Mr. Young raises a number of contentions as to why Yachtinsure has not established the materiality of Mr. Young's alleged misrepresentations, including: 1) its failure to produce any underwriter manuals or guidelines for assessing risks in marine insurance contracts; 2) its lack of expert witnesses who could testify to what considerations would be material to the reasonable underwriter in determining coverage; and 3) its alleged bad faith attempts to evade its obligations under the policy by raising irrelevant alleged misrepresentations by Mr. Young.

As explained more fully in Part III.E *infra*, however, an insured's breach of even a collateral warranty will excuse an insurer's nonperformance under a marine insurance policy. *See Lloyd's of London*, 539 F.3d at 24 (citing *Commercial Union*, 190 F.3d at 31 ("Under the federal rule and the law of most states, warranties in maritime insurance contracts must be strictly complied with, even if they are collateral to the primary risk that is the subject of the contract, if the insured is to

26

Yachtinsure contends that Mr. Young breached his warranty of truthfulness, included in the policy renewal agreement.[11]   An insured may be precluded from recovering under his marine insurance policy based on his breach of his warranty of truthfulness.  *See Markel Am. Ins. Co.* v. *Veras*, 995 F. Supp. 2d 65, 77-78 (D.P.R. 2014).  An insured's misrepresentations of facts known to him at the time he applied for the policy — e.g., misrepresentation of the vessel's purpose, misrepresentation of the value or claim history of the vessel, misstatement of the vessel's history of damages and repairs — may excuse an insurer from having to perform under the policy.  *Id.; Atl. Specialty Ins. Co.*, 480 F. Supp. 3d at 334.

It is at this point that my somewhat different approach to the applicable framework for resolving the question of summary judgment here becomes evident.  The doctrines of uberrimae fidei and breach of the warranty of truthfulness each "relate to the

---

recover.")).  Thus, Mr. Young's specific contentions regarding the materiality of the provisions of the Hurricane Plan to Yachtinsure at issue do not engage with the likely facts that *may* influence a prudent insurer, a determination I make affirmative in light of the record before me.

[11] Mr. Young declared in the Hurricane Plan that "To the best of my knowledge and belief the information provided in connection with this hurricane plan is true and I have not withheld any material facts." [Dkt. No. 24-5 at 2] Further, the Yachtinsure policy contains a clause providing "if you or any insured/operator conceals or misrepresents any material fact or circumstance, whether before or after a loss, this policy is VOID and you will no longer be protected by it."  [Dkt. No. 1-1 at 18]

circumstances under which an insurer may void a contract because of misstatements or omissions" of then-existing facts. *Atl. Specialty Ins. Co.*, 480 F. Supp. 3d at 334.  The First Circuit has established, however, that a provision in a marine insurance policy "by which the insured stipulates that something shall be done or omitted after the policy takes effect and during its continuance," is properly considered a promissory warranty, as opposed to a factual representation. *Lloyd's of London*, 539 F.3d at 23 (citing *6 Couch on Insurance*, § 81:14); *accord. Com. Union Ins. Co.*, 190 F.3d at 31 ("a promise by which the assured undertakes that some particular thing shall or shall not be done, or that some condition shall be fulfilled, or whereby he affirms or negatives the existence of a particular state of facts." (internal quotations omitted)).

Several district judges in this circuit have applied this definition to find promissory warranties in marine insurance policies when a policy's language obligates the insured to undertake or refrain from specific future conduct. *See, e.g.*, *N. Assur. Co. of Am.*, 845 F. Supp. 2d at 414 ("exclusion of charters for more than six passengers" found a promissory warranty under federal law); *Nieto-Vicenty* v. *Valledor*, 984 F. Supp. 2d 17, 21 (D.P.R. 2013) (passenger limitation and compliance provisions in policy constitute promissory warranties because they were promises "that some particular thing shall or

shall not be done" (internal citations and quotations omitted));
*Maclean*, 299 F. Supp. 3d at 234 ("Named Operator Endorsement is
a promissory warranty because it is a provision by which the
insured stipulates that something shall be done or omitted after
the policy takes effect and during its continuance." (internal
quotations omitted)).  A representation in a marine insurance
policy may constitute a promissory warranty even if its language
does not include the typical phrases associated with warranties
— e.g. "The insured warrants," "Warranted that," "Conditional
on" — as long as it operates as a promise to perform, or not
perform, specific future acts upon which coverage is
conditioned.  *See N. Assur. Co. of Am.*, 845 F. Supp. 2d at 414
(though nominally an "exclusion of coverage" the passenger limit
operated as a promissory warranty because it represented a
promise by the insured not to engage in specific prohibited
conduct, upon which coverage was contingent); *Com. Union Ins.
Co.*, 190 F.3d at 31 (holding a policy term that "at first
glance, . . . does not appear to be a warranty," was, when "read
in the context of the contract in its entirety," a promise of
conduct for the policy period).

Yachtinsure claims three of Mr. Young's statements made in
relation to the Hurricane Plan amount to a breach of duty.  I
turn now to determine whether Mr. Young's three declarations to

Yachtinsure under consideration constitute a representation of then existing fact or a promissory warranty.

**D.   _Interpretation of Relevant Terms of the Hurricane Plan_**

Yachtinsure asserts that three of Mr. Young's statements or representations made while negotiating the insurance policy in April 2019 amounted to material representations and a violation of the doctrine of uberrimae fidei.  In response, Mr. Young disputes Yachtinsure's characterization of his statements as untruthful and claims that he more or less complied with all terms in the insurance policy and should therefore recover under the policy for the loss of SUMMER STAR.  The three alleged misrepresentations all stem from the Hurricane Plan Mr. Young completed in applying for the policy and the email exchange involving the parties' brokers and representatives occurring on April 19.

  1.   Question 15: Number of Lines Securing the Summer Star

Yachtinsure identifies Mr. Young's response to Question 15 of the Hurricane Plan as a material misrepresentation.  The Hurricane Plan elicited and Mr. Young answered:

> 15. How many **lines** are going to be used to secure the vessel and what is the **diameter** and **material** of those lines?

> 10 lines, 3/4 inch. Nylon braid

Yachtinsure cites Mr. Young's admission in an examination under oath that he traditionally only moored with four lines [Dkt. 27

at ¶48] as evidence of his misrepresentations in negotiating the insurance policy.  [Dkt. 26 at 13] Mr. Young contends that his response to Question 15 is ambiguous and can be read as a promise that Mr. Young would use either the configuration of lines stated in the Hurricane Plan, or an equivalent or higher-weight-bearing configuration of lines.  [Dkt. 30 at 13]

I find this provision of the Hurricane Plan, however, to be unambiguous.  The plain language of Mr. Young's answer to Question 15 cannot be reasonably read to convey anything other than that Mr. Young would use ten lines of 3/4 inch Nylon braid to secure the vessel.  I reject Transpac's strained reading of this language because it attempts to introduce ambiguity to an otherwise clear phrase without any apparent basis in the text. By asking "how many" lines would be used, Yachtinsure was asking Mr. Young to confirm the *number* of lines he would use to secure the SUMMER STAR.  There is no language in Question 15 or in Mr. Young's response to suggest that a fewer number of stronger lines would act as an adequate substitute for ten nylon lines 3/4 inch diameter.  Finding "no reason to contravene the clause's obvious meaning," *Norfolk S. Ry. Co.*, 543 U.S. at 31–32, I conclude that Mr. Young's response to Question 15 of the Hurricane Plan states, unambiguously that he will secure the vessel with the configuration of mooring lines he specified in his response.

I find that the plain language of the Hurricane Plan's
Question 15 calls for a promise of future conduct by asking how
many lines "are going to be used," to secure the SUMMER STAR.
Mr. Young responded in the Hurricane Plan with what is, in
essence, a stipulation that he would secure the SUMMER STAR with
the mooring configuration he identified when the policy took
effect and during its continuance.  Thus, I find this provision
of the Hurricane Plan constitutes an unambiguous promissory
warranty to secure the SUMMER STAR with ten nylon mooring lines
that were 3/4 inch diameter in normal circumstances (i.e., in
the absence of a named or numbered storm).

The Insurer also alleges an affirmative misrepresentation
in Mr. Young's April 19 email stating that it was "[c]onfirmed
that in the event of a named/numbered storm, mooring lines will
be doubled," in response to Yachtinsure's request that Mr. Young
double the mooring lines securing the vessel during such storms.
[Dkt. No. 28-3 at 3]  As Mr. Young acknowledged in a statement
under oath, he was moored to the single-mooring ball with only
six lines during Hurricane Dorian. [Dkt. 39-1 at 26]

I construe Mr. Young's email in the context of 1)
Yachtinsure's prior request for "confirmation that the lines
will be doubled in the event of a named/numbered windstorm"; and
2) Yachtinsure's subsequent email stating that "we just need the
HPP document updated with confirmation that the insured will

double the amount of lines in the event of a windstorm." [Dkt. No. 28-3 at 2]  Read in that context, Mr. Young's email can only be read as a clear promise that, in the event he encountered a named or numbered storm, he would double the number of mooring lines and use twenty 3/4 inch nylon lines to secure the vessel.

Mr. Young's email confirmation was a promise to undertake a specific course of future conduct if, during the policy period, he encountered the circumstance of a named windstorm.  As such, I find Mr. Young's email confirmation is a promissory warranty in Mr. Young's marine insurance policy to use twenty 3/4 inch lines to secure the vessel in the event of a named or numbered storm.

## 2.  Question 19: Safety Arrangements in the Event of a Named Storm Warning

Finally, Yachtinsure asserts Mr. Young's response to Question 19 was a misstatement of facts known to him on April 15, 2019.  Question 19 of the Hurricane Plan asked and Mr. Young responded:

> 19. What arrangements have you made for the safety of your vessel in the event that a named storm warning is issued?
> Constant weather watch and advance reservation at marinas.

[Dkt. No. 24-5 at 2]

Yachtinsure contends, based on the question's phrasing "what arrangements *have you made*", that Mr. Young's response

must be read as a statement that he *already had* marina reservations when he signed the Hurricane Plan in April of 2019. Mr. Young contends, however, that this reading tortures the meaning of his response because this reservation would not "be magically in place for all weather, geographic limitations and storm conditions." [Dkt. 30 at 8] Mr. Young further argues that his efforts to make reservations at Crown Bay Marina two days prior to Hurricane Dorian might meet his obligations under the Hurricane Plan and should be seen to raise a sufficient factual dispute to defeat Yachtinsure's motion for summary judgment. [*Id.*]

I read Question 19 in the Hurricane Plan as eliciting at least in part an answer for past actions Mr. Young had taken to mitigate storm risk. I recognize, however, Mr. Young wrote that one of his arrangements is "constant weather watch" which is, of course, a strategy he may only employ in future endeavors when a named storm warning is issued.  As I read Mr. Young's response to Question 19, Mr. Young was making a representation both as to past action he had taken in making advanced reservations at marinas and a promise to seek an advanced reservation at a marina in the event that a named storm warning is issued. Whether Yachtinsure placed importance in Mr. Young's answer to Question 19 as to future actions involving weather watch when it approved the policy, Yachtinsure was still entitled also to rely

upon Mr. Young's representations regarding his past actions with respect to marina reservations.

Parsed in that fashion, I find latent ambiguity in this question and Mr. Young's response to it.  That said, this aspect of the Hurricane Plan does not prevent me from making final determinations regarding the question of summary judgment.

### E.   *Consequences of Breach of Promissory Warranties*

Under both federal law and New York law, a breach of a promissory warranty will permit the insurer to void a marine insurance contract.  *Lloyd's of London*, 539 F.3d at 24 ("the prevailing view, under federal law . . . is that a breach of a promissory warranty in a maritime insurance contract excuses the insurer from coverage."); *Safe Harbor Pollution Ins. v. River Marine Enterprises, LLC*, 593 F. Supp. 3d 82 at 92 (S.D.N.Y. 2022) (New York law mirrors federal law regarding breach of warranty in marine insurance agreements).

In *Lloyd's of London*, a boat-owner submitted an insurance claim following the sinking of his pleasure boat after the boat's exhaust hose came loose and the boat took on water through its exhaust system. *Lloyd's of London*, 539 F.3d at 21. During the investigation into the circumstances surrounding the accident, investigators found that the sinking was ultimately caused by "wear and tear, gradual deterioration, and lack of maintenance."  *Id.*  However, the First Circuit focused on a

clause in the boat's insurance policy that stated "if the scheduled vessel is fitted with fire extinguishing equipment, then it is warranted that such equipment is properly installed and is maintained in good working order. . . " *Id.* at 22.  The investigation discovered that that the vessel's fire extinguisher equipment had not, in fact, been inspected or certified within the preceding year and that the engine room fire extinguisher had been disconnected prior to the sinking. Notably, the investigation made no connection between the condition of the fire extinguisher and the loss of the boat. *Id*. at 21.

The First Circuit found that the clause related to fire extinguisher maintenance in the insurance policy was a promissory warranty on the part of the insured and determined that "the insured was in breach of the promissory warranty" since "the insured failed to produce any evidence of compliance with the promissory warranty relating to the fire extinguishers." *Id.* at 23.  Ultimately, the court applied the prevailing federal view that a breach of a promissory warranty by an insured voids the insurance contract even if the insured's breach was unrelated to the cause of the loss. *Id.*

An insured is required to comply strictly with the terms of its promissory warranties in a marine insurance policy. Material compliance will not satisfy the insured's obligations.

*Com. Union Ins. Co.*, Inc., 190 F.3d at 31 ("warranties in maritime insurance contracts must be strictly complied with . . . if the insured is to recover.").  This strict compliance requirement "stems from the fact that it is '[p]eculiarly difficult for marine insurers to assess their risk, such that insurers must rely on the representations and warranties made by insureds regarding their vessels' condition and usage.'"  *Markel Am. Ins. Co.*, 995 F. Supp. 2d at 77–78 (quoting *Com. Union Ins. Co.*, 190 F.3d at 31–32).

The weight of authority holds this strict compliance requirement applicable even to "collateral" warranties unrelated to the insured's claims for damages.  *See Lloyd's of London*, 539 F.3d at 24; *Com. Union Ins. Co.*, 190 F.3d at 31–32; *Guam Indus. Servs., Inc. v. Zurich Am. Ins. Co.*, 787 F.3d 1001, 1005 (9th Cir. 2015).  Whether the insured's breach of a promissory warranty in fact played a role in the events leading to the insured's loss is of no moment.  An insurer may deny coverage based on a breach of warranty, even if the breach has no causal connection to the insured's covered damages.  *See Lloyd's of London*, 539 F.3d at 21; *Markel Am. Ins. Co.*, 995 F. Supp. 2d at 77–78 ("It is irrelevant to our analysis whether the breach of warranty eventually gave rise to the damage caused to the vessel").

In the case now before me, I will consequently turn to an examination of the promissory warranties made in the SUMMER STAR's marine insurance policy to determine if they were adhered to throughout the duration of the policy.  There is no need for Yachtinsure to demonstrate that any potential breach of a promissory warranty ultimately led to the grounding of SUMMER STAR or to conduct a causation analysis surrounding the loss of the vessel.  Failure by Mr. Young to observe strictly the promissory warranties negotiated in the policy is sufficient grounds for the Yachtinsure to void the policy and refuse payout to Mr. Young.

## F.   *Plaintiff's Breach*

I find Yachtinsure has established beyond reasonable factual dispute that Mr. Young failed to meet his obligation of strict compliance with his warranties under the Hurricane Plan.

### 1.   Question 15

Mr. Young testified that he traditionally used only four lines to secure the vessel to a single mooring. [Dkt. 27 at ¶48-50]  He further testified that he used only six nylon lines to secure the vessel in Crown Bay during Hurricane Dorian.[12]  [Dkt

---

[12] The record leaves some uncertainty as to the size of lines Mr. Young actually used during Hurricane Dorian. Mr. Young testified that he purchased two additional 1 inch lines while he was moored in Crown Bay prior to the storm but the size of the other four lines Mr. Young traditionally used to moor the SUMMER STAR remains unclear. I find this uncertainty to be of no

29 at ¶49] It is undisputed on the summary judgment record,
therefore, that Mr. Young was not in compliance with the
promissory warranties he made in negotiating the insurance
policy with Yachtinsure because he did not secure the SUMMER
STAR with the ten 3/4 inch Nylon mooring lines he agreed to use
in his response to the Hurricane Plan's Question 15.

Mr. Young contends that his assurance to use ten 3/4 inch
lines is only applicable when docked at a marina, and therefore
is not pertinent when moored to a single-point mooring such as
he was during Hurricane Dorian.  I reject this reading of his
response in the Hurricane Plan. I am unpersuaded by this
interpretation because there is nothing in the Hurricane Plan
that indicates that Mr. Young's intention to use ten 3/4 inch
lines is confined only to when he was docked at a marina. If Mr.
Young planned to secure the vessel with ten lines only when
docked and to use fewer lines while moored, he could have
specified as much in his answer to Question 15.  Question 11 of
the Hurricane Plan, for example, asked for information about the
"marina or residence where the vessel is kept" and Mr. Young
responded, "*Moored* in Crown Bay, St Thomas USVI. . ." (emphasis
added).  Mr. Young later testified that he did generally remain

---

consequence, however, given my determination that Mr. Young was
required to comply strictly with the number and size of lines
(twenty 3/4 inch nylon lines) he agreed to use while negotiating
his insurance policy.

moored at Crown Bay, rather than docked in a marina.   With Mr. Young's acknowledgement that he would be moored at Crown Bay and, four questions later, his agreement to use ten 3/4 inch lines, the plain reading of Mr. Young's Hurricane Plan responses is that he was confirming to Yachtinsure that he would use at least ten 3/4 inch nylon braid lines whether or not he was moored to a single-point mooring or docked in a marina.

Mr. Young's additional assurances that he would double the mooring lines in the event of a named or numbered storm are separately sufficient to support summary judgment as to breach of contract. It is undisputed that Mr. Young did not double the number of mooring lines to secure the SUMMER STAR when a hurricane watch for Hurricane Dorian was issued on August 27th nor when Hurricane Dorian was approaching the US Virgin Islands on the morning of August 28th. Instead, Mr. Young makes an argument about the tensile strength of the lines he used, asserting that his six lines of indeterminate diameter had a holding strength equivalent to or higher than the 3/4 inch lines he had agreed to use.  I reject Mr. Young's assertions that 1) the thicker mooring lines he says he used to secure SUMMER STAR actually increased the holding strength of the lines; and 2) that he met his contractual obligations under the Hurricane Plan by using larger lines to secure the vessel.

First, the only evidence Mr. Young offers in support of his claim that his six-line configuration had a holding strength equivalent or higher than that of the twenty required 3/4 inch lines are his own unexplained calculations and an unauthenticated printout chart from an unknown website.  [Dkt. No. 30-2]  I find this evidence, such as it is, insufficient to support a genuine dispute for trial.  *See Robinson* v. *Bodoff*, 355 F. Supp. 2d 578, 582 (D. Mass. 2005) ("The failure to authenticate a document properly precludes its consideration on a motion for summary judgment."); *Torrech-Hernandez* v. *Gen. Elec. Co.*, 519 F.3d 41, 47 (1st Cir. 2008) ("the District Court is not obliged to accept as true or to deem as a disputed material fact, each and every unsupported, subjective, conclusory, or imaginative statement made to the Court by a party.").  It is for this threshold reason I reject Mr. Young's assertion that he has raised an issue of material fact as to whether the six 1 inch lines he used to secure the SUMMER STAR had the same strength as ten (or twenty) 3/4 inch lines and therefore, were sufficient to meet his contractual obligations.

More fundamentally, even if Mr. Young had raised a factual dispute as to the holding capacity of his lines, it would not be a material dispute for purpose of my summary judgment determination.  As a matter of law, Mr. Young was required to comply strictly to the unambiguous terms of his promissory

warranty to recover under his policy.  There can be no dispute that he failed to do so here.

Yachtinsure does not need to explain why it required the mooring configuration that it did although its reasoning is understandable, particularly in light of circumstances surrounding the actual loss of the SUMMER STAR after Mr. Young's six lines became unmoored from the mooring ball resulting in the vessel floating out to open sea during Hurricane Dorian. It does not matter whether the mooring line configuration was causally related to the loss of the SUMMER STAR or whether Mr. Radulewicz's actions acted as a third-party's intervening cause in the vessel's loss.  Mr. Young's admission that he did not use twenty 3/4 inch nylon braid lines to secure his boat during Hurricane Dorian — and thereby satisfy a prophylactic condition the policy called for — is sufficient to prevent him from recovering under the policy.  For this reason, I find Yachtinsure is entitled to summary judgment as to Count I of the Complaint.

### 2.   Question 19: Safety Arrangements in the event of a Named Storm Warning

Yachtinsure also asserts that Mr. Young's answers to Question 19 of the Hurricane Plan, related to arrangements made for the safety of the vessel during a named storm warning act as a basis to void his insurance policy and refuse payout. The

wording of Question 19 and Mr. Young's answer make the nature of
the provision ambiguous and ripe for further inquiry; I cannot
as a matter of law determine on this record whether Mr. Young's
answer to Question 19 regarding his advanced reservations was a
statement of fact or a promissory warranty.  Consequently, I
cannot determine on this record whether Mr. Young complied with
the Question 19 of the Hurricane Plan leading up to Hurricane
Dorian.

I deny summary judgment with respect to Question 19 because
fact finding is necessary to explain the latent ambiguity
introduced by reference to past reservations.  Further
proceedings would be necessary to develop the factual record as
to whether Mr. Young indeed had a month-to-month reservation in
Fajardo and, if not, whether his response to Question 19
violated the doctrine of uberrimae fidei, the warranty of
truthfulness, or a promissory warranty.  The issue of whether
Mr. Young had some obligation to sail into the path of the
hurricane in order to reach Fajardo, and whether he had
obligations to make further inquiries at nearer marinas after he
realized his plan to dock at Crown Bay was impossible, would
also need to be developed.  However, since I am not making my
grant of summary judgment to Yachtinsure on the basis of Mr.
Young's answer to Question 19, I conclude resolution of the
question of summary judgment in favor of Yachtinsure and of

dismissal of Count I does not require such further factual development.  Summary judgment is available solely as a result of the breach of promissory warranties in both challenged dimensions to Mr. Young's answer to Question 15.

### IV. CONCLUSION

For the foregoing reasons, I DENY Transpac's Motion [Dkt. No. 24] for summary judgment.  By contrast, I GRANT Yachtinsure's Motion [Dkt. No. 25] for summary judgment.  Having granted Yachtinsure the relief it seeks in this litigation, I DENY as moot so much of Yachtinsure's Motion as sought declaratory judgment for its Counterclaims.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE